**T–SHIRT WORLD, INC., Plaintiff-Appellee**

v.

**ARTLAND, INC., Defendants-Appellant**

Civil No. 81-329

District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 28, 1983

JOHN J. MAHON, ESQ., St. Thomas, V.I., *for plaintiff-appellee*

JOSEPH BRUCE WM. ARELLANO, St. Thomas, V.I., *for defendant-appellant*

CHRISTIAN, *Chief Judge*

## MEMORANDUM OPINION

In this appeal from the Territorial Court of the Virgin Islands, Division of St. Thomas-St. John appellant contends that the court below erred in several respects. Each assignment of error will be addressed.

The parties in this contract action entered into an oral agreement whereby T-Shirt World, Inc. (appellee) would supply T-Shirts to Artland, Inc. (appellant) for sale in each of Artland's three retail outlets. Either party could terminate the agreement at any time. Officers or employees of T-Shirt World would visit appellant's stores daily and restock the shelves of T-Shirts, as the stock had been depleted. The shirts were sold by T-Shirt World in one dozen packets. Upon delivery, a receipt would be presented to an officer of

appellant's stores for initialing. Artland had 30 days to pay for the shirts. During the first few years of this agreement, the parties were in a position of mutual trust. Appellee would decide which designs to stock in Artland's stores. This relationship was apparently quite profitable to both parties.

Occasionally customers of Artland would return a shirt as defective. Artland would give the customer a new shirt and return the occasional defective one to appellee who would then supply a good one. Because of the high volume of shirts sold by Artland (some 1,000 dozen each month), the appellant rarely bothered to inspect the deliveries.

Discord between the parties arose sometime early in 1980. Until this time the owner of T-Shirt World, Stanley Lawrence, dealt primarily with Artland through Roy Hemrajani. With the death of Roy Hemrajani in January 7, 1980, came, it seems, the end of the period of mutual confidence and trust. Nick and Ram Hemrajani succeeded to the position of control formerly held by their departed brother. Stanley Lawrence was now required to deal with Nick and Ram Hemrajani. Nick and Ram Hemrajani became disenchanted with Lawrence and began checking the deliveries of T-shirts more closely. They made attempts to stop Lawrence from supplying certain types and designs of T-shirts. However, Lawrence kept delivering as he saw fit and the Hemrajanis kept signing for, and paying for, all T-shirts delivered. Appellants became more distrustful and dissatisfied with Lawrence. In early April appellants terminated the agreement and demanded that Lawrence take back all the T-shirts then in stock in their stores, as they were not what appellants wanted. Lawrence agreed to the termination but refused to take back the shirts and demanded payment for them. Appellants refused to pay. Lawrence then instituted this suit to recover the claimed outstanding debt.

The court below found for T-Shirt World in the entire amount of its demand, $29,694.01. The trial court found that Artland acquiesced in the actions of appellee in continuing to supply such designs and styles as it wished, despite Artland's attempts to change the agreement. The court also held that the vast majority of the shirts were conforming, and that a reasonable time for rejection was one week. Appellants claimed that they had 22,000 shirts on hand as of the April 1980 termination and that it had since sold 9,000 of those T-shirts at a discount, because they were slow moving or odd sizes. As of the trial date appellant had 4,000 T-shirts remaining, approximately 1,000 of which were defective. After finding one week a rea-

149

sonable time to reject, the Court stated that since many of the 1,000 defective T-shirts could have arrived as early as 1977, Artland could not now reject them. Artland's counterclaims were all dismissed.

On appeal, appellant first argues that the findings of the court below, that appellee terminated the agreement and that there was no rejection of the merchandise on hand by appellant upon the termination of the agreement in April of 1980, are not supported by substantial evidence.

First of all, appellant is mistaken when it asserts that the lower court held that T-Shirt World terminated the agreement. The court found that it was appellant who terminated the agreement and that the termination was agreed to by the appellee. See trial transcript, vol. III, p. 208, lines 19–25 and p. 209, line 3.

As to the rejection, there certainly was evidence that the appellants failed to give timely and effective rejection. Indeed appellant did attempt to return the entire inventory as of April 1980. This attempted rejection or revocation was inadequate, however, for two reasons.

■■ According to the Uniform Commercial Code (U.C.C.) §§ 2—601 and 2—608 (11A V.I.C. §§ 2—601 and 2—608), a buyer may reject goods which do not conform to the contract or revoke acceptance of goods already received if the nonconformity of the goods substantially impairs their value. Under either rejection or revocation, the buyer's actions must be taken within a "reasonable time."

■ Appellant had no right to reject or revoke acceptance of conforming goods. The lower court held that Artland's attempts to change the contract terms failed and that they acquiesced in Lawrence's continuing to supply shirt styles and brands Artland did not really desire. With this we agree. Hence of the approximately 22,000 shirts on hand in April, at most 1,000 were nonconforming. Because some styles or sizes were slow-moving did not make them nonconforming. Appellant's decision to sell 9,000 of these slow-moving styles or sizes at a discount was of its own unilateral making. Therefore, as to 21,000 of the shirts, appellant had no right to reject or revoke acceptance.

■ The 1,000 or so defective shirts present a greater problem. The Territorial Court held that one week was a reasonable time period for rejection. It cited the extremely fast turnover as reason for this relatively short rejection time. Although we might have determined that a longer period would be within reason, it was a question for the fact-finder. Since we cannot say that the findings

150

are clearly erroneous, they will not be disturbed. See 2 Anderson, Uniform Commercial Code § 2—602:10 (2d ed. 1971); Dopieralla v. Arkansas, 499 S.W.2d 610 (Ark. 1973). The Territorial Court stated that since many of the 1,000 defective shirts could have been in appellant's possession since as early as 1977, and because Artland could not identify the 1,000 as having arrived in the last week of deliveries, then it could not allow Artland to claim a timely rejection or revocation of acceptance. We agree with the appellee that the 1,000 defective shirts probably represented the "dregs" of the hundreds of thousands of T-shirts sold to Artland since 1977. Further, we agree with the court below that absent some showing that the 1,000 or so defective shirts arrived during the last week of deliveries, appellants have not timely rejected the shirts given the one week rejection period. Appellant argues that the shirts were fungible within the meaning of U.C.C. § 1—201(17) (11A V.I.C. § 1—201(17)), and hence identification of delivery dates is unnecessary. However, the testimony at trial showed that the shirts varied in size, color, price, composition and popularity. Hence they were not fungible within the meaning of the Code.

Appellant also argues that the court below erred in holding that T-Shirt World did not "overstock" Artland in bad faith and that it did not breach the contract by raising its prices without notice to appellant. We disagree with both contentions. The number of T-shirts sold by Artland increased from year to year. Lawrence continued to use more shelf space and eventually the Hemrajanis desired to stop that expansion. However, we agree with the Territorial Court that appellants acquiesced in the shelf expansion by T-Shirt World. As to the price increases, acquiescence by Artland may be found from the fact that those prices were clearly shown on receipts which the Hemrajanis invariably signed.

Appellant further contends that appellee breached an express warranty under 11A V.I.C. § 2—313(1)(c). This section and subsection refer to a warranty created by sample and states:

> Any sample or model which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the sample or model.

In appellant's stores, above each bin of T-Shirts, there was a sign indicating by illustration the style or design on the shirt. As appellant states in its brief, these signs were designed to facilitate the retail customers' selection of shirts. However, appellant argues that these signs created a warranty as between T-Shirt World and

Artland. Once more we do not agree with Artland. Although a retail customer would be able to claim such a warranty as against Artland, there is no evidence to suggest that these signs were used as samples "which [were] made part of the basis of the bargain" between the parties to this suit. As appellant concedes, the signs were put up merely for the convenience of retail customers of the stores.

We conclude that the counterclaims asserted by appellant in the court below were properly dismissed. The judgment of the Territorial Court will be affirmed in all respects.